**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place**
**Boston, MA 02108**
**Phone:  (617) 994-6000**
**Fax: (617) 994-6024**

RECEIVED
SEP 2 8 2018
BY:_____

Leonard H. Kesten, Esq.
Michael Stefanilo, Jr., Esq.
Brody, Hardoon, Perkins & Kesten, LLP
699 Boylston Street, 12th Floor
Boston, MA 02116

Michaela C. May, Esq.
Bennett & Belfort, P.C.
24 Thorndike Street, Suite 300
Cambridge, MA 02141

**RE: Elizabeth Gebo v. Town of Chilmark and Brian Cioffi**
**MCAD Docket Number: 16NEM02982**
**EEOC/HUD Federal Charge Number: 16C-2016-02452**

Dear Counsel:

      Enclosed, please find a copy of an Order issued in the above-referenced matter. Respondents may file a position statement within 10 days of their receipt of the attached Order.

Very truly yours,

*[signature]*

Marc J. Perlman, Esq.
Investigator

## COMMONWEALTH OF MASSACHUSETTS
### COMMISSION AGAINST DISCRIMINATION

---

ELIZABETH GEBO,

      Complainant

      v.                      MCAD DOCKET NO. 16NEM02982

TOWN OF CHILMARK AND
BRIAN CIOFFI,

      Respondents

---

### ORDER

Pursuant to Rule 1.10 (6) of the Commission's Rules of Procedure, the Complaint is hereby amended to add a claim of discrimination based on disability, in violation of G.L. c. 151B, section 4, paragraph 16 and the Americans with Disabilities Act, as amended, as set forth in Complainant's motion to amend, received on May 16, 2018, attached hereto and incorporated by reference herein.

SO AMENDED this _21_ day of _September_ , 2018.

_Sunila S. George_

Sunila Thomas George
Investigating Commissioner

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

|  |  |
|---|---|
| ELIZABETH GEBO, | ) |
| *Complainant,* | ) |
| | ) |
| v. | ) |
| | ) |
| TOWN OF CHILMARK, | ) |
| and BRIAN CIOFFI, | ) |
| individually, | ) |
| | ) |
| *Respondents.* | ) |

MCAD No. 14 BEM 00526
EEOC No. 16C 2014-01028

## COMPLAINANT ELISABETH GEBO'S MOTION TO AMEND HER COMPLAINT

Complainant Elizabeth Gebo ("Ms. Gebo" or "Complainant") respectfully moves, to amend the Complaint to add a count of discrimination based on her disability, under Mass. Gen. Laws ch. 151B, § 4(16) and the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq*. In support thereof, Complainant states as follows:

1.     Under MCAD regulations, a charge of discrimination may be amended to allege "additional acts constituting unlawful discriminatory practices related to or arising out of the subject matter of the original complaint" with the amendment relating back to the original filing date. 804 C.M.R. §1.10(6)(a).

2.     Similarly, under the "scope of the investigation" rule, a claim that is not explicitly stated in the administrative complaint may be asserted in the subsequent court action so long as it is based on the acts of discrimination that the MCAD investigation could reasonably be expected to uncover. See Windross v. Village Automotive Group, Inc., 71 Mass. App. Ct. 861, 864-65 (2008).

3.      Indeed, an employee need not have precisely articulated every possible

theory of discrimination in his or her administrative charge, and need not have filed subsequent

administrative charges every time a subsequent discriminatory act occurred in order to have

satisfied the administrative filing requirements of Mass. Gen. Laws ch. 151B. See id.

4.      Turning to the instant matter, Complainant was treated for symptoms of anxiety and

depression beginning in or about 2012, of which Respondent Brian Cioffi[1] ("Mr. Cioffi"), then

the Chief of the Respondent Town of Chilmark Police Department ("the Department"), had

actual knowledge. Exhibit A, Affidavit of Elizabeth Gebo ("Gebo Aff."), at ¶¶ 6-8.

5.      Ms. Gebo's MCAD charge addresses her mood disorder, Respondents' knowledge

thereof, and facts underlying a finding of disability discrimination in several instances. See

Complaint ("Compl.") at ¶¶ 1, 51 72-84, 91-93, 103-105, 108, 110 (setting forth Gebo's mental

health symptoms and Respondents' knowledge thereof).

6.      Complainant attempted suicide in November 2013; shortly thereafter, mental health

professionals retained by the Department cleared Ms. Gebo to return to work. See Exhibits D, E;

Gebo Aff. at ¶¶ 7, 19.

7.      Complainant has also received diagnoses of post-traumatic stress disorder and bi-polar

disorder. Gebo Aff. at ¶¶ 8-9.

8.      Ms. Gebo's work situation, including without limitation, coercive and inappropriate

behavior by Mr. Cioffi, contributed to and exacerbated Ms. Gebo's mental health symptoms. See

Gebo Aff. at ¶¶ 3-10.

9.      Ms. Gebo describes the effect of her mental health disorders, including extreme weight

loss, feelings of anxiety, and attempted suicide. Gebo Aff. at ¶¶ 6-7.

---

[1]      Complainant now refers to Respondent Brian Cioffi as Mr. Cioffi, as he is no longer employed as the Chief of Respondent Chilmark's police department.

10.     Ms. Gebo's mood disorders are, together or separately, a disability under Mass. Gen. Laws c. 151B and the Americans with Disabilities Act, as amended, because they substantially limit her major life activities of, without limitation, caring for herself and eating. See Mass. Gen. Laws ch. 151B, § 1, ¶ 17(a); 42 U.S.C. § 12102(1)(A).

11.     Additionally, Ms. Gebo's mood disorders are a disability because Respondents regarded her as disabled and/or because she had a record of such impairment. See Mass. Gen. Laws ch. 151B, § 1, ¶ 17(b)-(c); 42 U.S.C. § 12102(1)(B)-(C).

13.     In 2014, Ms. Gebo's mental health deteriorated. See Gebo Aff. at ¶¶ 6-12.

14.     As a result, Ms. Gebo was constrained to seek a one-year medical leave from the Department, which request was granted. Gebo Aff. at ¶ 11.

15.     However, the Department (through Mr. Cioffi) informed Ms. Gebo near the end of her leave that she could not return to her job, purportedly because individuals with mood disorders are disqualified from serving as police officers. Gebo Aff. at ¶¶ 12-15. See Exhibit B.

16.     This statement was false.

17.     Contrary to Mr. Cioffi's statement to Complainant, there is no blanket rule requiring the termination of police officers with mood disorders. Gebo Aff. at ¶ 17.

18.     Rather, the regulations that Mr. Cioffi used to justify refusing to allow Complainant to return to duty applied only to *new hires* (which Complainant was not). Id. See Exhibit C, Excerpts of "Physician's Guide, Initial-Hire Medical Standards", published by the Commonwealth of Massachusetts Human Resources Division, at p. 15 (2015).

19.     Indeed, it is not unusual for police officers to have mood disorders or to have a history thereof.

20.     Further, a *per se* rule requiring the termination of police officers who have a mood disorder, or a history, thereof, would violate the ADA and Chapter 151B.

21.     Respondents could have, but did not, assess Ms. Gebo's fitness to return to duty. Gebo Aff. at ¶ 20.

22.     Respondents also refused to allow Ms. Gebo to remain employed as a reserve intermittent officer (commonly called a "special").

23.     By instead notifying her that she was not qualified to return of her disability, leading her to believe that her only viable choice was to resign, actually or constructively terminated Ms. Gebo's employment, and refusing to allow her to continue to remain employed as a "special," Respondents discriminated against Ms. Gebo because of disability, in violation of the ADA and Chapter 151B. See id. at ¶¶ 20-24.

WHEREFORE the Complainant respectfully moves the Commission to amend her complaint to add a count of disability discrimination.

DATED: April 27, 2018

Respectfully submitted,
Elizabeth Gebo
By her attorneys,

Michaela C. May (BBO# 676834)
mmay@bennettandbelfort.com
Christina E. Bazak (BBO # 698386)
cbazak@bennettandbelfort.com
Bennett & Belfort, P.C.
24 Thorndike Street, Suite 300
Cambridge, MA 02141
(617) 577-8800

## CERTIFICATE OF SERVICE

I, Michaela C. May, hereby certify that on this 27th day of April 2018, a true copy of this motion, and the exhibits and proposed order appended hereto, were served by first-class, pre-paid mail and e-mail upon the following:

Leonard H. Kesten, Esq.
Brody, Hardoon, Perkins & Kesten
699 Boylston Street
Boston, MA 02116
E: lkesten@bhplaw.com

Michaela C. May

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

|  |  |
|---|---|
| ELIZABETH GEBO, | ) |
| *Complainant,* | ) |
| | ) |
| v. | ) |
| | ) |
| TOWN OF CHILMARK, | ) |
| and BRIAN CIOFFI, | ) |
| individually, | ) |
| | ) |
| *Respondents.* | ) |

MCAD No. 14 BEM 00526
EEOC No. 16C 2014-01028

## <u>AFFIDAVIT OF COMPLAINANT ELIZABETH GEBO</u>

1. I, Elizabeth Gebo (née Elwell), make this statement based on my personal knowledge, unless otherwise indicated, in support of my motion to amend my complaint of discrimination and retaliation against Respondent Town of Chilmark ("Chilmark") and its former police chief, Brian Cioffi ("Mr. Cioffi") (together "Respondents").

2. I was hired by the Chilmark Police Department ("the Department") as a traffic officer in 2008; reappointed as reserve intermittent officer (commonly called a "special") in or about 2009; hired in a part-time capacity in 2011, in addition to my work as a "special"; and appointed as a full-time patrol officer in 2012. Mr. Cioffi became the Department's chief in 2009.

3. My mental health suffered while in Respondents' employ, due I believe in large part to coercive behavior and harassment directed at me by Mr. Cioffi. Mr. Cioffi and I engaged in an on-again-off-again relationship that was difficult for me to end. Over a period of years, it took me several attempts to end this relationship with finality.

1

4. Mr. Cioffi behaved in ways that I now see as manipulative and coercive. For example, when I told him I was expecting to become engaged to be married to my now-husband, he expressed disappointment, and made sure to remind me of all of the job opportunities I had benefited from because of his efforts. When I was successful at ending our relationship, my work environment became strained and uncomfortable.

5. Mr. Cioffi's behavior and retaliation for my insistence on ending the relationship is the crux of my complaint of sexual harassment and sex discrimination against Respondents.

6. In mid-2012, I was prescribed anti-depressants to help me with symptoms of anxiety, on the advice of Mr. Cioffi. I was losing weight. My weight bottomed out at 97 pounds, although I am 5'6" tall.

7. My mental health worsened. I attempted suicide. See Exhibits D, E. When I was being treated in the emergency room following these attempts, Mr. Cioffi intervened and prevented me from being hospitalized.

8. Medical records from that day suggest diagnoses major depressive disorder and bi-polar disorder.

9. I was later diagnosed with post-traumatic stress disorder.

10. Despite Mr. Cioffi's repeated efforts to get me to resume a sexual relationship with him, I steadfastly declined.

11. In or about December 2014, I requested and was granted by Chilmark's Board of Selectmen a year-long medical leave from the police department, due to my mental health conditions.

12. In or about November 2015, as my leave was nearing its end, I contacted Respondents about the prospect of returning to work.

13. Mr. Cioffi informed me that I could not return. Specifically, he told me that my history of mood disorders made me unqualified to be a police officer.

14. I asked Mr. Cioffi what rule he was referring to, but he would not tell me.

15. Based on Mr. Cioffi's statements, I was led to believe that I could not return to my job because of my disabilities. As a result, I resigned from the Department.

16. Later, by email, Mr. Cioffi sent me an excerpt of a rule purporting to state that history of mood disorders are disqualifying for police officers. A true copy of that email is appended hereto as Exhibit B.

17. The publication that Mr. Cioffi cited, <u>see</u> Exhibit C, was not applicable in any way. The publication referred to the qualifications of initial hires, but I was a police officer who had already completed the academy and was employed.

18. In retrospect, Respondents' claim that I could not return to duty also runs contrary to their earlier actions with respect to my mental health.

19. In 2014, the Department allowed me to return to work very soon after attempting suicide, with medical clearance, including through a psychologist retained by the Department. True copies of that correspondence are attached hereto as Exhibits D and E.

20. However, Respondents did not evaluate my fitness to return duty following my medical leave in 2015, and instead led me to believe that I had no viable choice but to resign because of my mood disorder.

21. I have since learned that it is not unusual for police officers to have mental illness or a documented history of them.

22. I believe that by refusing to allow me to return to duty and by misleading me into believing that I had no viable choice but to resign because of my mental health

3

conditions, or history thereof, Respondents discriminated against me because of my disabilities.

23. I also requested to stay on the Department's roster as a "special," which request Mr. Cioffi told me that Respondent Chilmark declined.

24. Again, I believe that Respondents took this action because of my disabilities.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 27TH DAY OF APRIL 2018.

_____
Elizabeth Gebo

4

# EXHIBIT B

**From:** Chief Brian A Cioffi <bcioffi@vineyard.net>
**Date:** August 23, 2016 at 9:36:32 AM EDT
**To:** Elizabeth Elwell <elizabeth.elwell@gmail.com>
**Subject: Re: November resignation**

Sent from my iPhone

On Aug 23, 2016, at 9:27 AM, Elizabeth Elwell <elizabeth.elwell@gmail.com>
wrote:

Can you please just confirm the date of my resignation?

Liz

Sent from my iPhone

1

On Aug 22, 2016, at 2:43 PM, Chief Brian A Cioffi
<bcioffi@vineyard.net> wrote:

We can. Around tomorrow not sure what your
schedule is?

Sent from my iPhone

On Aug 22, 2016, at 2:39 PM,
Elizabeth Elwell
<elizabeth.elwell@gmail.com>
wrote:

Brian,

Thank you, but unless I am reading
this incorrectly, I am seeing that
information is for initial hires. Please
find where it says this for already
employed police officers. Nothing
happened before I was part time
doing computer work, nor did
anything happen before I was
appointed as a full time police
officer. As my diagnosis has
changed, learning that the treatment
facility I was in was completely
incompetent, I am putting in time to
research this. If you would like to
discuss this, I am open to doing that
as well instead of over emails so we
do not continue to go back and forth.
Thank you.

Liz

Sent from my iPhone

On Aug 22, 2016, at
1:40 PM, Brian Cioffi

2

<bcioffi@vineyard.net> wrote:

Liz,

I attached the standards document from mass.gov website. Page 6 of the

medical standards section 5 letters a & b are relevant and page 15 of the

medical standards letter O is the part that discussed personality disorders.

I cut and pasted the sections below.

(5) Category A and Category B Medical Conditions

(a) A Category A Medical Condition is a medical condition

that would preclude an individual from performing the essential job

functions of a municipal police officer, or present a significant

risk to the safety and health of that individual or others.

(b) A Category B Medical Condition is a medical condition

that, based on its severity or degree,

3

may or may not preclude an individual from      performing the essential job functions of a municipal police

officer, or present a significant risk to the safety and health of that

individual or
     others.


(o) Psychiatric

1. Category A medical conditions include current or past

diagnoses of:

a. disorders of behavior,

b. anxiety disorders,

c. disorders of thought,

d. disorders of mood,

e. disorders of personality.

2. Category B medical conditions shall include:

a. a history of any psychiatric condition, behavior

disorder, or substance abuse problem not covered in Category A.  Such

history shall      be evaluated based on that individual's

history, current status, prognosis, and ability to respond to the stressors

4

of the job,

    b. any other
psychiatric condition
that results in

an individual not
being able to safely
and effectively
perform the job of

police officer.


Brian


-----Original
Message-----
From: Elizabeth
Elwell
[mailto:elizabeth.elwe
ll@gmail.com]
Sent: Monday,
August 22, 2016
11:01 AM
To: Brian Cioffi
Subject: November
resignation


Brian,

When I resigned in
November you stated
that you had read
somewhere that a

police officer with a
personality disorder
or mood disorder
cannot be a

police officer. You
told me you would
email me where you
read that and I

never received said
email. Please find that
and send it to me like
we had

5

discussed.

Liz

Sent from my iPhone

<massachusetts-
medical-standards-
2014-physicians-
guide.docx>

# EXHIBIT C



Commonwealth of Massachusetts – 2014

Human Resources Division

# Physician's Guide

Initial-Hire Medical Standards

Table of Contents

|      |                                                                      | Pages   |
|------|----------------------------------------------------------------------|---------|
| I.   | Introduction                                                         | 1       |
| II.  | General Information                                                  | 2       |
| III. | The Medical Examination Process                                     | 3 - 4   |
| IV.  | Initial Medical Standards for Municipal Police Officers             | 5 - 16  |
| V.   | Initial Medical Standards for Municipal Fire Fighters               | 17 - 31 |
| VI.  | Municipal Police Officer Essential Functions                        | 32 - 36 |
| VII. | Municipal Fire Fighter Essential Functions                          | 37 - 43 |
| VIII.| Linkage of PAT Events with Underlying Physiological Requirements    | 44 - 49 |
| IX.  | Police PAT Events                                                   | 50 - 51 |
| X.   | Fire PAT Events                                                     | 52 - 53 |

List of Appendices

| Diabetes Mellitus          | A |
|----------------------------|---|
| Medical Examination Form   | B |
| Medical Appeal Process     | C |

I.    **INTRODUCTION**

This Guide provides examining physicians with Massachusetts Human Resource Division's (MA-HRD) medical standards for initial-hire evaluation of applicants for municipal police and fire fighter positions. The Guide also provides reference material to assist the physician in the form of:

- ☐  Essential Job Functions for both police and fire fighters,

- ☐  Linkage of MA-HRD police and fire fighter Physical Abilities Test events to essential job tasks,

- ☐  Physical Fitness Standards Test Course for Police Officers/Physical Ability Test

- ☐  Physical Fitness Standards Test Course for Fire Fighters/Physical Ability Test

Please be advised that the enclosed medical standards are updated and effective as of **December 1, 2014**.

The purpose of the standard Medical Examination Form is to obtain a medical history from the examinee, to record your medical examination and test results, and to report on the results of your medical determination. A new page has been added with the current revision. The additional page (page 7) is to be used to report any Category B conditions that are not disqualifying at the time of the initial-hire examination, but that are known to have a progressive course that may, at some time in the future, have an adverse effect on a police officer or fire fighter's ability to safely and effectively perform essential job functions.

All medical examination records are the property of the appointing authority. They must be kept accessible for the duration of the examining physician's contract in the event of an audit, appeal or disability proceeding. If the contract terminates or expires, the physician will be instructed to transfer these records to his or her successor. The physician may, however, retain copies of the examination reports.

Before you conduct a medical examination, please familiarize yourself with the essential functions, including the physical demands, of the job. You should also review the Medical Standards for the appropriate job. Finally, please conduct a thorough medical examination as prescribed by these Medical Standards. When you have completed the medical examination, you will be required to certify in the Medical Verification Section (Page 6, Section I) of the Medical Examination Form whether or not the examinee passed the medical exam. The appointing authority will notify the examinee of the results of the exam and will forward pages one and six of the Medical Examination Form to HRD.

## II.   GENERAL INFORMATION

A physician approved by the community for which the examinee seeks to work must sign off medical examinations and any subsequent re-examinations.

Municipal physicians are responsible for reviewing the results of the examination and advising the department whether or not an examinee has passed the medical examination under the applicable medical standards.

Information and records concerning an examinee's medical examination must be kept confidential and in conformance with medical records requirements.

Any community that concludes that a physician has conducted an incomplete or less than thorough medical examination is required to notify HRD, and return the results of the exam to the physician with an explanation of the reasons why. The physician is then required to review the community's concerns and respond to those concerns in a thorough and complete manner.

An examinee who fails the medical examination is permitted one re-examination under the Initial Medical Standards Program. The subsequent re-examination should focus on the standards not met by the candidate in the initial examination and should entail a specialist examination. However, should the candidate's failure in the initial examination involve procedural issues (e.g. a laboratory or diagnostic test not completed or not completed properly by the candidate), the subsequent re-examination must address the procedural issues in question, which may or may not necessitate a specialist exam. In either case, the outcome of the subsequent re-examination will take precedence over the outcome of the initial examination in determining whether a candidate meets the initial-hire medical standards.

The Medical Examination Form is subject to audit by HRD. HRD has the right to obtain copies of documentation of medical examinations from examining physicians for review by HRD's medical consultants. This audit is to assess the quality and uniformity of examinations, to ensure compliance with consistent application of HRD's medical protocol for conducting medical examinations, and to provide information needed to improve and update the examination process and forms. All deficiencies in examinations performed will be discussed with examining physicians. By signing page one of the Medical Examination Form, the candidate grants HRD access to his or her medical examination records. Pages one and six of the Medical Examination Form must be sent to HRD by the appointing authority.

Unless there is a prior agreement between the candidate and the community in terms of who will be responsible for the expenses incurred in the examination process, the candidate is responsible for paying the expenses. Before administering the medical examination process, the examining physician should therefore advise the examinee of the costs associated with the process, especially if a specialist exam and/or additional testing are involved.

Any questions examining physicians have for the Massachusetts Human Resources Division should be directed to the Medical and Physical Fitness Standards Team at 617-727-3777.

III.     **THE MEDICAL EXAMINATION PROCESS**

The referring department will have completed Section A of the Medical Examination Form and will have given the Medical Examination Form to the examinee to complete Section C (Consent and Certification) and Section E (Medical History) before reporting to your office for the examination. If these sections are not completed, please have the examinee complete them. Carefully review the medical history with the examinee and record in detail in Section H (Additional Notes) any additional information you obtain. **Please note that the examinee is now asked whether he/she is currently receiving any disability benefits.** There should be sufficient data recorded regarding any positive medical history to justify the fitness determination you make.

Each examinee must receive a comprehensive medical examination, which must include all systems necessary to ensure that he or she meets the applicable Medical Standards. The basic medical examination should be inclusive of, but not limited to all items listed in Section F (Medical Examination) of the Medical Examination Form. You should also examine other areas, as indicated based upon the medical history, even if they are not listed in Section F. Please elaborate on any positive medical findings in sufficient detail to justify your determination of whether the candidate passes the criterion or not. Examination of the breasts, rectum or prostate should be included only when they are clinically indicated in your judgment, based upon the history provided by the examinee. Otherwise, these examinations should be offered to examinees for their own wellness and performed if the examinee consents. Providers are strongly encouraged to provide education on glaucoma. A nurse practitioner registered to practice in an expanded role by the Massachusetts Board of Registration in Nursing, or a physician's assistant registered to practice under a physician's supervision by the Massachusetts Board of Registration in Medicine may perform the medical examination. The final review and determination of whether the candidate passes the examination must be by an MD or DO physician licensed in Massachusetts.

HRD requires that each examinee receive the following tests: pure-tone audiogram, visual acuity, color vision, peripheral vision screening, spirometry with at least determination of $FEV_1$ and $FEV_1/FVC$, and a screening test for tuberculosis. Space is provided on the Medical Examination Form for any additional laboratory and diagnostic tests that may be requested by the appointing authority. Testing for the presence of illicit or controlled drugs may be required by the appointing authority. HIV testing is not indicated for routine pre-placement screening. It is important that any additional tests that are required by the municipality be specified prior to the start of the medical examination.

When you have completed your examination, you may determine that additional information such as hospital records, specialized tests (e.g., an exercise tolerance test) or an examination by a medical specialist are needed to make a determination regarding whether or not an examinee meets the Medical Standards. Please advise and provide the candidate with specific guidance regarding the type of information needed and acceptable sources where it can be obtained. In the case of specialist opinions, the examinee should be advised to consult a specialist who is Board Certified in the appropriate specialty by a specialty board recognized by the American Board of Medical Specialists.

When the medical history has been reviewed, the medical examination has been performed, all laboratory and diagnostic test results have been reviewed and any necessary additional information obtained and assessed, the municipal physician should complete Section I (Medical Verification Section). This part may **not** be completed by a nurse practitioner or a physician's assistant. The determination of passage or failure of the exam should be based upon the ability of the examinee to meet the requirements of the applicable Medical Standards at the time of the medical examination.

Medical conditions listed in the Medical Standards are classified as "Category A" or "Category B" conditions. Category A conditions are considered absolutely disqualifying. For Category B conditions you are required to

consider whether the particular examinee's condition would prevent him or her from safely and effectively performing the essential functions of the position. Both the Medical Standards and the Essential Functions are found in this Physician's Guide (pgs. 5-31 and 32-43, respectively). If you find an examinee not qualified, you will need to indicate whether the condition is Category A or Category B and cite the applicable section of the Medical Standards in the Medical Verification Section. The examining physician must carefully document the rationale for finding the examinee not qualified.

If you find that an examinee failed to provide a complete and accurate medical history, you will need to explain such under Section I of the Medical Examination Form, "Physician's Notice of Examinee's Failure to Provide Complete & Accurate Medical History." By itself, failure to provide a complete and accurate medical history will not necessarily disqualify the examinee from meeting the medical standards, but may subject the examinee to administrative disqualification of employment or other adverse action by the appointing authority.

If an examinee is found qualified despite a potentially disqualifying condition, the logic behind this determination should be documented in Section H (Additional Notes) of the Medical Examination Form.

When an examinee is found to be in need of further evaluation or treatment, the municipal physician may refer the person to local clinics, hospitals or specialists. Except in the case of a bona fide emergency when a delay in treatment might prove harmful, the municipal physician should offer to provide a list of several sources and leave the selection of a specific provider up to the examinee.

## IV.   Medical Standards for Municipal Police Officers

(1) Medical Evaluation: Each municipal police department shall establish and implement a pre-placement medical evaluation process for candidates. During the medical evaluation, the physician shall evaluate each individual to ascertain the presence of any medical conditions listed in these standards, or any medical conditions not listed which would prevent the individual from performing the essential job functions without posing significant risk to the safety and health of him/herself or others. It is our intent to encourage the use of professional judgment regarding medical conditions that are not specifically listed.

The examining physician shall not certify as having met the medical requirements of these standards any candidate who is determined to have a Category A condition.

The examining physician shall not certify as having met the medical requirements of these standards any candidate who is determined to have a Category B condition that is of sufficient severity, either from the condition or the treatment, to prevent the candidate from performing the essential functions of a police officer without posing a significant risk to the safety and health of him/herself or others.

(2) The medical evaluation shall minimally include the following:

- ☐ a comprehensive medical history in addition to the medical history check-off list completed as Section E of the MA-HRD Medical Examination Form, to include significant past exposures, including, but not limited to, noise, blasts (concussive forces), indoor shooting range (lead), and any prior injuries, with particular attention to head injuries, any hospitalizations and surgeries and any medications used on a regular basis or repeatedly for any perceived medical condition (e.g.: over-the-counter allergy medications or over-the-counter pain medications).

- ☐ (b) height and weight
- ☐ (c) vital signs: pulse, respiration, blood pressure, and, if indicated, temperature
- ☐ (d) dermatological system
- ☐ (e) ears, eyes, nose, mouth, throat
- ☐ (f) cardiovascular system
- ☐ (g) respiratory system
- ☐ (h) gastrointestinal system
- ☐ (i) genitourinary system
- ☐ (j) endocrine and metabolic systems
- ☐ (k) musculoskeletal system
- ☐ (l) neurological system
- ☐ (m) basic mental status evaluation to include, at a minimum, the following:
  - ☐ general appearance (e.g.: kempt, disheveled),
  - ☐ affect,
  - ☐ state of alertness,
  - ☐ orientation to place, person and time,
  - ☐ comprehensibility in expression,
  - ☐ insight,
  - ☐ coherence of thought processes.

The initial examiner is encouraged to refer any applicant found to have an apparent abnormality in mental status evaluation to a doctoral level mental health professional (psychologist or psychiatrist) for further evaluation.  Current or recent use of psychotropic medications shall be reviewed by a board-certified psychiatrist. Candidates with current or past psychiatric diagnoses in the domains noted in Section IV.(6)(o) must be referred to a board-certified psychiatrist, preferably one with experience evaluating individuals for safety-sensitive job positions, for final determination of appropriateness to function as a police officer or fire fighter.

- ☐ (n) audiometry. Audiograms should be performed in a sound-treated booth compliant with the most recent version of ANSI S3.1 (Criteria for permissible ambient noise during audiometric testing) with equipment calibrated to the most recent version of ANSI standard S3.6 (Specification for Audiometers). If a booth is unavailable, the test room sound pressure levels should not exceed those specified in the Federal OSHA "Audiometric test rooms" standard (29 CFR 1910.95, Appendix D).
- ☐ (o) visual acuity, color vision and peripheral vision testing.
- ☐ (p) pulmonary function screening . Screening pulmonary function evaluation shall consist of spirometry with no use of short acting bronchodilator agents for 8 hours prior to testing.  Testing should be performed in accordance with the most recent version of the American Thoracic Society "Standardization of Lung Function Testing."  Screening spirometry should be administered by an individual both trained in the use of the spirometry instruments and experienced in performing the examinations.
- ☐ (q) a review of hepatitis B immunization status.
- ☐ (r) a Purified Protein Derivative (PPD) test or interferon-gamma release assay (IGRA) for tuberculosis, and
- ☐ (s) other diagnostic testing where indicated.

(3) The medical evaluation process may also include:

- ☐ (a) a review of tetanus immunization status.

(4) All medical information collected as part of a medical evaluation shall be considered confidential medical information, and shall be released by the physician only with the specific written consent of the candidate. The physician shall report the results of the medical evaluation to the candidate, including any medical condition(s) disclosed during the medical evaluation and the recommendation whether the candidate is medically certified to perform as a police officer. The physician shall inform the police department and HRD only whether or not the candidate is medically certified to perform as a police officer. The specific written consent of the candidate shall be required to release confidential medical information to the police department and HRD, following guidelines set forth under the Americans With Disabilities Act (ADA) and other relevant policies.

(5) Category A and Category B Medical Conditions

- ☐ (a) A Category A Medical Condition is a medical condition that would preclude an individual from performing the essential job functions of a municipal police officer, or present a significant risk to the safety and health of that individual or others.
- ☐ (b) A Category B Medical Condition is a medical condition that, based on its severity or degree, may or may not preclude an individual from performing the essential job functions of a municipal police officer, or present a significant risk to the safety and health of that individual or others.

(6) The following biological systems shall be components of the Initial Medical Standards for police officers:

    (a) Musculoskeletal

        1. Head and Skull

            a. Category A medical conditions shall include:
                i. uncorrected decompression craniectomy with residual defect larger than 1 square inch.

            b. Category B medical conditions shall include:
                i. deformities of the skull, loss or congenital absence of the bony substance of the skull which limit the ability to wear a mask and/or protective breathing apparatus,
                ii. thoracic outlet syndrome sufficient to compromise required activity,
                iii. congenital cysts, chronic draining fistulas, or similar lesions,
                iv. any other head condition that results in an individual not being able to safely and effectively perform the job of police officer.

        2. Neck and Cervical Spine

            a. Category A medical conditions shall include:
                i. none.

            b. Category B medical conditions shall include:
                i. cervical arthrodesis/fusion,/instability,
                ii. cervical canal stenosis,
                iii. cervical radiculopathy or myelopathy,
                iv. herniated disc,
                v. degenerative disc disease,
                vi. abnormal chronic contraction of neck muscles,
                vii. decompression laminectomy,
                viii. any other neck condition that results in an individual not being able to safely and effectively perform the job of police officer.

        3. Thoracic/lumbar/sacral Spine

            a. Category A medical conditions shall include:
                i. symptomatic spondylolisthesis, whether or not surgically corrected.

            b. Category B medical conditions shall include:

                i. lumbar laminectomy or discectomy, with or without fusion,
                ii. degenerative disease/spondyloiysis/pars defect
                iii. structural abnormality, fracture, or dislocation,
                iv. degenerative disk disease,
                v. herniated disk/sciatica/radiculopathy,
                vi. spinal stenosis,
                vii. spinal surgery not covered in Category A,
                viii. any other spinal condition that results in an individual not being able to safety and effectively perform the job of police officer.

        4. Extremities

a. Category A medical conditions shall include:
   i. hemipelvectomy,
   ii. hip disarticulation,
   iii. above-the-knee amputation,
   iv. lack of either hand,
   v. lack of either thumb proximal to the nail cuticle.

b. Category B medical conditions shall include:

   i. severe limitation of motion of a joint, fibrosis, or arthrodesis,
   ii. amputations not covered in Category A:
      a. whole or partial digit amputation other than the thumb,
      b. amputation of multiple digits,
      c. partial foot amputations including multiple toes on the same foot,
      d. transtibial amputation,
      e. any other amputation not covered in Category A.
   iii total joint arthroplasty:
      i. shoulder,
      ii. elbow,
      iii. wrist,
      iv. thumb, first, or second digit,
      v. hip,
      vi. knee,
      vii ankle,
   iv. deformity or dislocation of a joint or limb,
   v. joint reconstruction, ligamentous instability, or joint replacement not covered in (iii),
   vi. chronic osteoarthritis or traumatic arthritis,
   vii. inflammatory arthritis,
   viii. osteomyelitis,
   ix. compressive neuropathies including carpal tunnel syndrome or ulnar nerve palsy,
   x. required use of stabilizing orthopedic braces,
   xi. any other extremity condition that results in an individual not being able to safety and effectively perform the job of police officer.

**(b) Eyes And Vision**

The medical evaluation shall minimally include visual acuity (Snellen) and peripheral vision testing using a standardized testing device (Titmus or Optec Vision Screener or other similar vision screening device).

Contact lenses are not permitted to meet the uncorrected standard.

X-chrom contact lens use is not permitted to meet the color standard.

When the candidate is being tested, he/she must present without wearing contact lenses for at least several hours, so that uncorrected vision can be accurately tested.

1. Category A medical conditions shall include:
   a. Uncorrected distance vision worse than 20/100 in either eye.
   b. corrected distant vision worse than 20/20 in the better eye UNLESS – the vision in the better eye alone is at least 20/25 AND the vision with both eyes together is 20/20 or better,
   c. Peripheral vision of less than 70 degrees temporally and 45 degrees nasally in either eye on screening examination AND/OR any history of conditions limiting field of vision will necessitate additional assessment by an eye care professional who will perform a formal detailed quantitative visual field assessment to determine if the binocular visual field is 140 degrees (at least 70 degrees temporally in each eye) above and below the meridian,

    d. Demonstration of color vision deficit on testing by Ishihara or Richmond pseudo-isochromatic plates.
Candidates who demonstrate a color deficiency with Ishihara or Richmond testing may be re-tested with a Farnsworth D-15. Two or more major "cross-over" errors (defined as a sequence jump of 4 or more in the cap sequence created by the test subject) on the Farnsworth D-15 is a Category A condition,

    e. Vision (refraction) corrective surgery that has not stabilized in terms of diopter changes documented at least 2 weeks apart or if there is residual glare, halos, starburst, monocular diplopia, continued use of steroid drops, presence of haze on examination, microstriae, dryness affecting functional vision, active infection or loose epithelium.

2. Category B medical conditions shall include:

    a. diseases of the eye such as cataracts, retinal detachment, progressive retinopathy, glaucoma or optic neuritis, which, if present, and not severe enough to be disqualifying should be followed on a regular basis to ascertain continued adequate visual capability to safety and effectively perform the essential police duties,

    b. any other ophthalmological surgical procedures, such as, but not limited to retinal detachment repair, periorbital muscle procedures,

    c. any other vision disorder or eye condition that results in an individual not being able to safely and effectively perform the job of police officer.

## (c) Ears And Hearing

The medical evaluation shall minimally include audiograms performed in a sound-treated booth compliant with the most recent version of ANSI S3.1 (Criteria for permissible ambient noise during audiometric testing) with equipment calibrated to the most recent version of ANSI standard S3.6 (Specification for Audiometers). If a booth is unavailable, the test room sound pressure levels should not exceed those specified in the Federal OSHA "Audiometric test rooms" standard (29 CFR 1910.95, Appendix D).

1. Category A medical conditions shall include:

Hearing deficit in pure tone thresholds in both ears, the deficit in each ear averaging 35 dB HL or worse at 500, 1000, 2000 and 3000 Hz,

Candidates failing the Category A pure tone threshold standard and who still wish to be considered for appointment will be required to have follow-up examinations that include:

full audiological examination, including speech reception threshold (SRT) and speech discrimination testing (NU-6 word lists) in both ears individually,

AND

full otological examination.

In order to pass they must demonstrate:

Pure tone thresholds in better ear indicating average hearing deficit at 500, 1000, 2000, and 3000 Hz to be lower than 35 dB HL,

AND

Performance score of 80% or better on the speech discrimination test in the better ear.

**HEARING AIDS:**

Initial hearing examinations <u>must</u> take place <u>unaided</u>.

Candidates who cannot pass the initial examination should be referred to a licensed audiologist for the follow-up examination.  Candidates may use hearing aids for the follow-up examination.  Candidates using hearing aids must pass the follow-up examination based on sound field-testing, using the criteria listed above.

2. Category B medical conditions shall include:

    a. perforated tympanum,

    b. auditory canal - atresia, severe stenosis, or tumor,

    c. severe external otitis,

    d. auricle - severe agenesis or traumatic deformity,

    e. mastoid - severe mastoiditis or surgical deformity,

    f. Meniere's disease, labyrinthitis or any disorder of equilibrium,

    g. otitis media,

    h. any other hearing disorder or ear condition that results in an individual not being able to safely and effectively perform the job of police officer.

(d) Nose, Mouth, And Throat

  1. Category A medical conditions shall include:

    a. tracheostomy,

    b. aphonia,

    c. absent sense of smell,

    d. congenital or acquired deformities which interfere with wearing a gas mask.

  2. Category B medical conditions shall include:

    a. congenital or acquired deformities not covered in Category A,

    b. defects of articulation that materially interfere with verbal communication,

    c. defects of rate (stuttering, stammering, or cluttering) that interfere with verbal communication,

    d. chronic severe rhinitis,

    e. any other nose, oropharynx, trachea, esophagus, or larynx condition that interferes with breathing or speech or otherwise results in an individual not being able to safely and effectively perform the job of police officer.

(e) Respiratory

  1. Category A medical conditions shall include:

    a. current lung abscess or current empyema,

    b. active untreated pulmonary tuberculosis,

    c. current pneumothorax,

    d. interstitial disease with abnormal exercise oxygen desaturation(<90%),

   e. obstructive pulmonary disease, meeting the following criteria:

    i. cough and low grade wheezing between exacerbations,

    ii. $FEV_1/FVC < 0.7$ **AND** $FEV_1 < 50\%$ predicted at testing with spirometry performed as described in Section IV(2)(o)[1],

    iii. required use of short-acting bronchodilatory medications prior to exercise.

2. Category B medical conditions shall include:

    a. lobectomy or pneumonectomy,

    b. obstructive disease not meeting Category A criteria,

    c. chronic bronchitis,

    d. emphysema,

    e. bronchiectasis,

    f. history of bronchiectasis, bronchitis, fibrous pleuritis, fibrosis, cystic disease, tuberculosis, mycotic lung disease, or pneumothorax,

    g. interstitial disease with normal exercise oxygen saturation,

    h. any other respiratory condition that results in an individual not being able to safely and effectively perform the job of police officer.

(f) Cardiovascular

1. Cardiac

    a. Category A medical conditions shall include:

        i. current diagnosis of angina pectoris,

        ii. current congestive heart failure,

        iii. ventricular aneurysm,

        iv. acute or chronic pericarditis, endocarditis, or myocarditis. Endocarditis with resultant significant valvular lesions, or myocarditis leading to myocardial insufficiency,

        cardiac or multi-organ transplant or left ventricular assist device or other mechanical aide to circulation,

        vi. third degree AV block without cardiac pacemaker,

        vii. coronary artery disease, cardiac hypertrophy, or other cardiac condition without evidence of a functional capacity equal to or greater than 12 METs without evidence of ischemia,

        viii. recurrent syncope,

        ix. history of sudden cardiac death syndrome,

        x. hemodynamically significant valvular heart disease,

        xi. Non-rheumatic atrial fibrillation with CHADS 2 score $\geq$ 2  or $CHA_2DS_2$-VASc score $\geq$ 1 **not** taking anticoagulant medication.  (for persons taking anticoagulant medication, see section IV.(l)1.(c) ),

---

[1] Vestbo J, Hurd SS, Agusti AG, *et al*. Global Strategy for the Diagnosis, Management and Prevention of Chronic Obstructive Pulmonary Disease, GOLD Executive Summary. *Am J Respir Crit Care Med.* 2012.

    xii. automatic implantable cardioverter defibrillator (AICD).

  b. Category B medical conditions shall include:

    i. coronary artery disease not covered in Category A,

    ii. significant *arrhythmias (either hemodynamically significant or in representing an elevated risk of hemodynamically compromising rhythm alteration),*

    iii. cardiac hypertrophy,

    iv. history of myocardial infarction, coronary artery bypass, coronary angioplasty, stent placement, or atherectomy,

    v. congenital abnormality,

    vi. cardiac pacemaker,

    vii. any other cardiac condition that results in an individual not being able to safely and effectively perform the job of police officer.

2. Vascular System

  a. Category A medical conditions shall include:

    i. congenital or acquired lesions of the aorta and major vessels,

    ii. marked circulatory instability as indicated by orthostatic hypotension, persistent tachycardia, and severe peripheral vasomotor disturbances,

    iii. aneurysm of a major vessel, congenital or acquired,

    iv. untreated persistent hypertension (systolic blood pressure of 160 mmHg or greater or diastolic blood pressure of 100 mmHg or greater),

    v. current diagnosis of embolism or thrombophlebitis.

  b. Category B medical conditions shall include:

    i. persistent hypertension controlled through medication (systolic blood pressure less than 160 mmHg and diastolic blood pressure less than 100 mmHg),

    ii. peripheral vascular disease, including intermittent claudication, Raynaud's disease, and Buerger's disease,

    iii. recurrent thrombophlebitis,

    iv. chronic lymphedema,

    v. severe or symptomatic varicose veins or venous insufficiency,

    vi. any other vascular condition that results in an individual not being able to safely and effectively perform the job of police officer.

(g) Gastrointestinal

  (1) Category A medical conditions shall include:

    a. liver or multi-organ transplantation,

    b. active gastrointestinal bleeding.

  (2) Category B medical conditions shall include:

    a. cholecystitis,

    b. gastritis,

    c. chronic or acute hepatitis,

    d. hernia,

    e. inflammatory bowel disease,

    f. intestinal obstruction,

    g. pancreatitis,

    h. bowel resection,

    i. gastrointestinal ulcer,

    j. cirrhosis,

    k. diverticulitis,

    l. any other gastrointestinal condition that results in an individual not being able to safely and effectively perform the job of police officer.

(h) Reproductive

    1. Category A medical conditions shall include:

        a. none.

    2. Category B medical conditions shall include:

        a. pregnancy, for its duration. Any candidate who is pregnant shall be evaluated based on the candidate's ability to perform as a police officer. Such evaluation shall be based in part on the timing of training and duties as related to pregnancy duration and postpartum recovery. Furthermore, a pregnant candidate shall be informed of the potential risks to her fetus in the performance of essential job functions, due to possible exposures to hazardous materials and physical contact,

        b. any other reproductive condition that results in an individual not being able to safely and effectively perform the job of police officer.

(i) Genitourinary

    1. Category A medical conditions shall include:

        a. renal disease requiring dialysis,

        b. renal or multi-organ transplantation.

    2. Category B medical conditions shall include:

        a. any other renal, urinary, or genital condition that results in an individual not being able to safely and effectively perform the job of police officer.

(j) Neurological

    1. Category A medical conditions shall include:

        a. ataxia,

        b. cerebrovascular disease with documented episodes of neurologic impairment such as cerebrovascular accidents ( CVAs) and transient ischemic attacks (TIAs),

        c. multiple sclerosis with activity or evidence of progression within previous three years,

        d. muscular dystrophy,

        e. myesthenia gravis,

        f. ALS,

        g. all epilepsy syndromes to include psychomotor, focal, petit mal, or grand mal seizures other than for those with all of the following:

      i. i.no seizure for 1 year off all anti-epileptic medications or 5 years on a constant dose of the same medication,

      ii. normal CT and epilepsy protocol MRI of the brain,

      iii. normal neurological examinations, and

      iv.a definitive statement from a qualified neurologist specializing in seizure disorders (epileptologist) attesting to items i. through iii. above, and that the candidate is neurologically cleared for police academy training and the performance of a police officer's essential job functions.

h. single first-time unprovoked seizure or unexplained episode of loss of consciousness less than 6 months prior to evaluation,

i. choreoathetosis,

j. dementia,

k. any disorder affecting equilibrium which is acute, episodic, chronic, or recurrent.

2. Category B medical conditions shall include:

a. congenital conditions and malformations,

b. migraines,

c. clinical disorders with paresis, paralysis, loss of coordination, abnormal motor function, or abnormalities of sensation,

d. history of subdural, subarachnoid, or intracerebral hemorrhage,

e. traumatic brain injury, concussion or multiple incidents of head trauma,

f. any other neurological condition that results in an individual not being able to safely and effectively perform the job of police officer.

(k) Skin

1. Category A medical conditions shall include:

a. none.

2. Category B medical conditions shall include:

a. non-localized, i.e., widespread, skin disease,

b. extensive skin grafts,

c. contact allergies,

d. any other dermatologic condition that results in an individual not being able to safely and effectively perform the job of police officer.

(l) Hematopoietic and Lymphatic

1. Category A medical conditions shall include:

a. hemorrhagic states requiring replacement therapy, including hemophilia,

b. sickle cell disease (homozygous),

c. chronic anticoagulation therapy.

2. Category B medical conditions shall include:

a. anemia, leukopenia, or thrombocythemia,

b. polycythemia vera,

c. splenomegaly,

d. history of thromboembolic disease,

e. any other hematological condition that results in an individual not being able to safely and effectively perform the job of police officer.

(m) Endocrine And Metabolic

　　1. Category A medical conditions shall include:

　　　　a. uncontrolled diabetes mellitus,

　　　　b. insulin dependent diabetes not controlled by the use of a pump or basal/bolus techniques,

　　　　c. insulin dependent diabetes not meeting criteria described in Appendix A.

　　2. Category B medical conditions shall include:

　　　　a. Diabetes mellitus,

　　　　　Note: Any patient with diabetes is required to provide medical information indicating that they meet the requirements described in Appendix A.

　　　　b. diseases of the adrenal gland, pituitary gland, parathyroid gland, or thyroid gland of clinical significance,

　　　　c. nutritional deficiency disease or metabolic disorder,

　　　　d. any other endocrine or metabolic condition that results in an individual not being able to safely and effectively perform the job of police officer.

(n) Tumors and Malignant Disease

　　1. Category A medical conditions shall include:

　　　　a. none.

　　2. Category B medical conditions shall include:

　　　　a. malignant disease which is newly diagnosed, untreated, or currently being treated. The medical evaluation of any candidate with malignant disease which is newly diagnosed, untreated, or currently being treated shall be deferred until treatment has been completed. Treated malignant disease shall be evaluated based on that individual's current physical condition and on the likelihood of that individual's disease to recur or progress.

　　　　b. any other tumor or malignancy that results in an individual not being able to safely and effectively perform the job of police officer.

(o) Psychiatric

　　1. Category A medical conditions include current or past diagnoses of:

　　　　a. disorders of behavior,

　　　　b. anxiety disorders,

　　　　c. disorders of thought,

　　　　d. disorders of mood,

　　　　e. disorders of personality.

　　2. Category B medical conditions shall include:

　　　　a. a history of any psychiatric condition, behavior disorder, or substance abuse problem not covered in Category A. Such history shall be evaluated based on that individual's history, current status, prognosis, and ability to respond to the stressors of the job,

　　　　b. any other psychiatric condition that results in an individual not being able to safely and effectively perform the job of police officer.

(p) Conditions Not Otherwise Covered

    1. Category A medical conditions shall include:

        a. none.

    2. Category B medical conditions shall include:

        a. connective tissue and autoimmune diseases, including dermatomyositis, lupus erythematosis, scleroderma, and rheumatoid arthritis,

        b. history of heat stroke, frostbite, or other thermal injury,

        c. potentially transmissible infectious disease,

        d. sleep disorders such as obstructive sleep apnea, central sleep apnea and narcolepsy,

        e. multi-system degenerative disorders,

        f. any other systemic condition that results in an individual not being able to safely and effectively perform the job of police officer.

(q) Chemicals, Drugs, And Medications

    1. Category A medical conditions shall include:

        a. active alcoholism or substance abuse.

    2. Category B medical conditions shall include the regular use of various chemicals and drugs, including -- but not limited to -- the following categories:

        a. cardiovascular agents,

        b. narcotics,

        c. sedative-hypnotics,

        d. stimulants,

        e. psychoactive agents,

        f. systemic steroids,

        g. any other chemical, drug, or medication that results in an individual not being able to safely and effectively perform the job of police officer.

# EXHIBIT D

# Dominic J Maxwell MD
# Child, Adolescent, & Adult
# Psychiatry
15 Church St Vineyard Haven MA 02568  508 687 9592

January 9, 2014

Re. Elizabeth Elwell  DOB  11/01/1987

Brian Cioffi
Chief of Police
Chilmark, MA  02535

VIA ELECTRONIC MAIL

Dear Chief Cioffi,

I am writing to provide documentation regarding
Elizabeth Elwell's progress.

Elizabeth has been in treatment with me since
11/25/2013.

She has been compliant with treatment and responded
positively to medication interventions.

It is my assessment that Elizabeth is now stable to
return to work as a police officer in the Town of
Chilmark and to carry a firearm for said purposes.

Elizabeth's treatment with me at this time is
ongoing, and it is imperative that she maintain
regular appointments with me .

Please let me know if you have any questions or
concerns.

Regards,


Dominic J Maxwell MD
Psychiatrist


C:   Elizabeth Elwell

# EXHIBIT E

### *Leo F. Polizoti, Ph.D.*

*DIRECT DECISION INSTITUTE*
*Licensed Psychologist/Health Service Provider*
*Law Enforcement Consultation Program*

November 21, 2013

Re: Officer Elizabeth Ellswell
     Chilmark Police Department

I evaluated Officer Ellswell on November 15, 2013 following a referral from
Chief Cioffi. She was seen at the ER of Martha's Vineyard Hospital following an
overdose of prescribed medications. There was a concern of a possible suicide attempt.

I obtained information from Chief Cioffi, her spouse and the clinician at the hospital
who was dealing with her case to assist in my assessment.

Officer Ellswell was quite open and forthcoming during the evaluation which lasted
three hours. Her mental status was within normal limits and she denied any suicidal
ideation at that time and when she took the medication overdose. Her spouse verified
that she had not made any comments regarding a wish to commit suicide.

She suffers from severe daily migraines with moderate positive effect from medication.
She ran out of her anti-depressant medication while at a week-long training and called
her PCP who was on vacation in Florida and obviously could not see her. He prescribed
Ativan (anti-anxiety medication) which she took along with Elavil. She stated that she
took 10-14 pills but there is some confusion regarding the amount taken. The Ativan
reportedly did not show up on the toxicology screen at the hospital. This discrepancy
needs to be clarified.

It appears, from my evaluation that she had an adverse effect from suddenly
discontinuing the anti-depressant medication. It was reported by the Chief that she had
been somewhat out of sorts for a week and she reported to me that she does not have a
clear recollection of what was occurring for a few days. It appears that stopping the
medication because resulted in a reaction in which her cognitive functions

were not clear. Her headaches were severe and she wanted them to stop.
This combination of confusion and her migraines resulted in her apparently taking too much medication. She reported no desire to commit suicide. She apparently was not educated regarding the proper use of the medications and this added to the problem.

I released her with her spouse and she was to spend a few days with him and her in-laws. I also performed some psychotherapeutic interventions in addition to the evaluation.

I recommended that she seek psychotherapy and have a psychiatrist prescribe her medication. I also advised her to speak with her neurologist regarding her medication. Additionally, I recommended that she have her PCP advocate for her to get a therapist without having to wait for an extended period of time.

In my opinion, she is fit for restricted duty (light duty) until December 15, 2013 which will give her some time to begin to put together her treatment program. Following the light duty, she may be reinstated to full unrestricted duty unless there are other issues that arise and depending on the judgment of the Chief of Police.

Leo F. Polizoti, Ph.D.

Police, Consulting Psychologist
Licensed Psychologist/Certified Health Service Provider

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place, Boston, MA 02108**
**Phone:  (617) 994-6000 Fax:  (617) 994-6024**

---

MCAD DOCKET NUMBER: 16NEM02982           EEOC/HUD CHARGE NUMBER: 16C-2016-02452
FILING DATE: 08/31/16                                VIOLATION DATE:  11/06/15

---

Name of Aggrieved Person or Organization:
Elizabeth  Gebo
22 Stoney Hill Lane
West Tisbury, MA 02575
Primary Phone: (508)560-3179 ext. _____

---

Named is the employer, labor organization, employment agency, or state/local government agency who discriminated
against me:
Town of Chilmark
Attn: Director of Human Resources
401 Middle Road
Chilmark, MA 02535
Primary Phone: (508)645-2107 ext. _____

Brian  Cioffi, Police Chief, Individually
15 State Road, P.O. Box 340
Chilmark, MA 02535
Primary Phone: (508)645-3310 ext. _____

No. of Employees:        25+

Work Location:

---

Cause of Discrimination based on:
Sex discrimination / Sexual Harassment; Retaliation

---

The particulars are:
I, Elizabeth Gebo, the Complainant believe that I  was discriminated against by Town of Chilmark, Brian  Cioffi, Police
Chief, Individually, on the basis of  Sexual Harassment and Retaliation.  This is in violation of M.G.L. c. 151B Section 4
(16A) (4) (4A) and Title VII

see attached

---

I hereby verify, under the pains and penalties of perjury, that I have read this complaint and the allegations contained herein
are true to the best of my knowledge.

_____
(Signature of Complainant)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☐ EEOC | |

and EEOC

State or local Agency, if any

NAME (Indicate Mr., Ms., Mrs.)        HOME TELEPHONE (Include Area Code)

Mrs. Elizabeth Gebo                   508 560 3179

STREET ADDRESS     CITY, STATE AND ZIP CODE          DATE OF BIRTH

22 Stoney Hill Lane  West Tisbury MA                  11/1/1987

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

NAME                    NUMBER OF EMPLOYEES, MEMBERS       TELEPHONE (Include Area Code)

Town of Chilmark                                          508 645 - 2107

STREET ADDRESS  PO Box 119   CITY, STATE AND ZIP CODE          COUNTY

401 Middle Road   Chilmark MA 02535                      Dukes

NAME                                 TELEPHONE NUMBER (Include Area Code)

Police Chief Cioffi                  508 645 3310

STREET ADDRESS  PO Box 340   CITY, STATE AND ZIP CODE          COUNTY

15 State Rd   Chilmark MA 02520                          Dukes

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| ☐ RACE | ☐ COLOR | ☒ SEX | ☐ RELIGION | ☐ AGE |
| ☒ RETALIATION | ☐ NATIONAL ORIGIN | | ☐ DISABILITY | ☐ OTHER (Specify) |

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)    LATEST (ALL)
2/2011                 11/6/15

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See Attached Complaint

RECEIVED

AUG 31 2016

OCT 28 2016

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

8/31/16

Date

Charging Party (Signature)

EEOC FORM 5 (Test 10/94)

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION
One Ashburton Place, Room 601
Boston, MA 02108

|  |  |
|---|---|
| Elizabeth Gebo | ) |
| Plaintiff | ) |
|  | ) |
|  | ) |
| Vs. | ) |
|  | ) |
| Town of Chilmark | ) |
| Brian Cioffi | ) |
| Defendants | ) |



AUG 31 2016

**Complaint Narrative:**

1.      Elizabeth Gebo is a Caucasian woman.  Ms. Gebo was a Police Officer with
the Chilmark Police department. After working successfully as a traffic officer
and later a "Special" (Reserve Intermittent) Officer, she accepted a position as
a full time police officer at the Chilmark Police Department.  During the
course of her employment, the now Chilmark Police Chief Brian Cioffi started
to make sexual advances toward Ms. Gebo.  At first Ms. Gebo rejected said
advances, however over time, pursuant to Chief Cioffi's persistence, Ms.
Gebo found herself in a sexual relationship with Chief Cioffi. Chief Cioffi
increased Ms. Gebo's shifts and made sure she worked a similar schedule as
him. While still working as a Special Officer, Chief Cioffi secured part-time
employment for Ms. Gebo to work on computer systems for all Martha's
Vineyard police departments.  This in effect allowed Ms. Gebo to go from
part-time employment to full-time employment with the Chilmark Police
Department. Ms. Gebo, on a number of occasions, tried to end the
relationship with Chief Cioffi but was manipulated into maintaining said
relationship.  When Ms. Gebo informed Chief Cioffi she was getting engaged,
Chief Cioffi expressed his displeasure.  When Ms. Gebo got married to her
now husband, Chief Cioffi informed Ms. Gebo that he was leaving his wife as

means to keep Ms. Gebo in a relationship with him. This in turn made the work environment uncomfortable for her if they were not involved in a sexual relationship. Ms. Gebo attempted suicide and reported to her medical provider that she was threatened and/or intimidated by her male peers at work, referring to Chief Cioffi. Chief Cioffi made sure that said suicide attempt was not officially recorded as such and allowed Ms. Gebo to return to work shortly thereafter. Ms. Gebo threatened suicide in the Chilmark Police station by holding her duty firearm to her head. Chief Cioffi took the firearm away from her and allowed Ms. Gebo to continue to work without any report of such incident. Ms. Gebo eventually took a leave of absence pursuant to the hostile work environment that had developed over the course of her relationship with Chief Cioffi. On November 6, 2015, Ms. Gebo returned to the Chilmark Police Department to discuss her return to the police force. Chief Cioffi informed Ms. Gebo that she could not return to the police force pursuant to reasons related to her medical leave. She subsequently resigned due to Chief Cioffi's reasons and her fear of returning to a hostile work environment.

2. The Town of Chilmark, as Brian Cioffi's supervisors and Chief Cioffi failure to investigate and take prompt and adequate remedial action in response Chief Cioffi's continually harassing Ms. Gebo constitute sexual harassment, hostile work environment and retaliation in violation of G. L. c. 151B, on account of the Chief Cioffi's interference with Ms. Gebo's right to a non-hostile work environment.

3. As a result of the Police Department and the town of Chilmark's failure to adequately respond to these incidents, Ms. Gebo has suffered and will continue to suffer substantial monetary damages and significant emotional distress.

**BACKGROUND**

4.    In June of 2008, Ms. Gebo (maiden name Elwell) is hired as a traffic officer for the Chilmark Police Department.

5.    Ms. Gebo meets Officer Brian Cioffi.

6.    In August of 2008, Ms. Gebo enters into a relationship with Mr. Gebo (her then boyfriend, whom she will then later marry).

7.    Officer Cioffi becomes the Chilmark Police Chief on July 1, 2009.

8.    In June of 2009, Ms. Gebo is promoted to "Special" (Reserve Intermittent) Officer for the Chilmark Police Department.

9.    Ms. Gebo and Chief Cioffi share a platonic relationship with each other outside of work. They also have a friendship with both parties' respective partners. The two couples frequently have dinner together and participate in activities together, usually on a weekly or bi-monthly basis.

10.   Chief Cioffi and his wife also have a friendship with both Ms. Gebo's and Mr. Gebo's parents.

11.   In the winter of 2010, Chief Cioffi begins to work with Ms. Gebo on day shifts, and more frequently, evening shifts.

**Sexual Harassment**

12.   In late February of 2011, during a night shift, Chief Cioffi asks Ms. Gebo while they are driving in a cruiser, "What would you do if I kissed you?"

13.   Ms. Gebo rejects Chief Cioffi's offer.

14.   Later within the same night, Chief Cioffi tells Ms. Gebo, "you're killing me" referring to Ms. Gebo's rejection of Chief Cioffi's offer to kiss her and his feelings for her (which Chief Cioffi later discloses).

15.   At the end of the shift that night, Chief Cioffi tells Ms. Gebo he has feeling for her, Ms. Gebo again rejects his offer.

16.   Chief Cioffi attempts to kiss Ms. Gebo, but she rejects his kiss.

17.   In March of 2011, Chief Cioffi is measuring to potentially re-do flooring at Ms. Gebo's parents' house, where she and Mr. Gebo reside, and kisses Ms. Gebo when no one is present.

18. Shortly thereafter Chief Cioffi puts Ms. Gebo on a similar schedule to his so they would share shifts.

19. Chief Cioffi admits on the night that he discloses that he has feelings for Ms. Gebo he has been putting her on shifts with him in order to work with her more.

20. In March of 2011, Chief Cioffi and Ms. Gebo engage in sexual activity one night while in a cruiser, but do not have intercourse at that time.

21. In March of 2011, Chief Cioffi and Ms. Gebo have intercourse in the women's locker room, located in the Chilmark Police Department.

22. March 14, 2011, Ms. Gebo tells Chief Cioffi she no longer wishes to have a sexual relationship with him.

23. The sexual relationship between Ms. Gebo and Chief Cioffi resumes a short time later.

24. Late May of 2011, the sexual relationship again ends.

25. Early June of 2011, Chief Cioffi tells Ms. Gebo he is jealous of the relationship Ms. Gebo has with her then boyfriend, Mr. Gebo.

26. During the summer of 2011, Chief Cioffi tells Ms. Gebo that he loves her.

27. During the summer of 2011, Ms. Gebo is assigned to the midnight shift. Chief Cioffi and Ms. Gebo engage in a sexual relationship during said shifts.

**Hostile Work Environment**

28. In August of 2011, Ms. Gebo again tries to end the sexual relationship with Chief Cioffi.

29. In August of 2011, Ms. Gebo expresses to Chief Cioffi that she and Mr. Gebo intend to get engaged. Chief Cioffi expresses to Ms. Gebo that he is upset about her and Mr. Gebo's pending engagement.

30. On August 14, 2011 Ms. Gebo tells Chief Cioffi that she is officially engaged to Mr. Gebo.

31. Ms. Gebo notices that during the time when she and Chief Cioffi were in a sexual relationship, she has more shifts, overtime, and opportunities at the Chilmark Police Department.

32. During the course of the relationship, Ms. Gebo is occasionally told by other officers in the department that they notice she receives special treatment and is treated differently by Chief Cioffi than they are.

33. In August 2011, Chief Cioffi offers Ms. Gebo a part-time job working for the Martha's Vineyard Law Enforcement Council, which includes all of the Martha's Vineyard police chiefs, in order to improve the computer program the island towns utilize.

34. Ms. Gebo accepts his offer.

35. Chief Cioffi tells Ms. Gebo that he created the position to keep her at the department.

36. Frequently during the time Ms. Gebo is employed as a part-time employee/special officer, Ms. Gebo, Chief Cioffi, other police officers (including police chiefs) and other civilians (depending on the week) have lunch every Friday at the Chilmark Police Department.

37. During one of these lunches, in the presence of other police officers (including police chiefs) and civilians, Chief Cioffi tells Ms. Gebo that if she ever got pregnant, he would fire her. Also attending said lunch is attorney Jack Collins. Jack Collins, along with being a "Special" police officer with the Chilmark Police, is a labor attorney and the General Counsel for the Massachusetts Chiefs of Police Association.

38. On April 21st of 2012 Ms. Gebo marries Mr. Gebo.

39. Chief Cioffi, his wife, and child are invited to the Gebo's wedding with the child being the ring bearer for said wedding.

40. On the day that Ms. Gebo gets married. Chief Cioffi, his wife and child leave the wedding reception early.

41. Chief Cioffi expresses that he was upset at the wedding, which is why he left.

42. Later that evening, Chief Cioffi tells Ms. Gebo he is leaving his wife.

43. Chief Cioffi states that he has told his wife of such intentions.

44. Chief Cioffi tells Ms. Gebo that he has moved into a separate building on his property.

45. Approximately two months later, Chief Cioffi tells Ms. Gebo that he has moved back into his house and expresses to Ms. Gebo his intentions to stay with his wife.

46. April 23, 2012 Chief Cioffi invites Ms. Gebo to attend a Children Cove Training held in a Best Western Hotel.

47. During the summer of 2012, Ms. Gebo starts to have anxiety and loses weight, dropping to under 100 pounds.

48. July 1, 2012, Ms. Gebo is promoted to full-time officer at the Chilmark Police Department.

49. Chief Cioffi communicates to Ms. Gebo that he has played an active role in her promotions, pursuant to their relationship.

50. Chief Cioffi expresses to Ms. Gebo that he believes she will be chief in the future.

51. August of 2012, Ms. Gebo starts taking anti-depressants.

52. September 2012 through February 2013, Ms. Gebo attends the police academy.

53. Chief Cioffi continues to have sex with Ms. Gebo during her time in the academy, at times travelling and spending nights off island in hotels where they engage in sexual activity.

54. January 19, 2013 Chief Cioffi emails Ms. Gebo after she blocks him on her phone during an argument: "Now u want to talk.  U just told me u were done…Yup as u say.  I tried.  U didn't.  U ended it this time.  Not me.  U tried to get me to.  Did not work though."  Ms. Gebo replies: "How can you do all that with me then go off island all day with her."

55. Later that same night Chief Cioffi invites Ms. Gebo to attend an eight day program at the Woburn Police Department.

56. April 8, 2013 Chief Cioffi invites Ms. Gebo to attend the course "Street Level Narcotics."

57. In April 2013, Ms. Gebo is requested by the West Tisbury Police to assist in giving a presentation at the West Tisbury School on "sexting", following an incident at the school.

58. Ms. Gebo becomes frustrated with Chief Cioffi's negative response to the West Tisbury Police Chief's strategy and plan for the presentation.

59. Ms. Gebo tells Chief Cioffi that she will not participate in the presentation due to his unwillingness to cooperate with the West Tisbury Police Chief and the arguments between the two chiefs as a result.

60. Chief Cioffi tells Ms. Gebo she has to do the presentation.

61. Chief Cioffi ultimately agrees to move forward with the plan the West Tisbury Police Chief wishes to execute.

62. On April 25, 2013 Chief Cioffi emails Ms. Gebo a PowerPoint entitled "Sexting Epidemic" for her and Mr. Gebo to present at the West Tisbury School.

63. Ms. Gebo and Mr. Gebo subsequently present the PowerPoint at the West Tisbury School.

64. April 25, 2013 Chief Cioffi invites Ms. Gebo vie email to attend the MACA's 3rd Annual Statewide Conference.

65. April 29, 2013 Chief Cioffi request via email for Ms. Gebo to register the both of them for the MACA's 3rd Annual Statewide Conference.

66. Chief Cioffi and Ms. Gebo attend said conference and engage in sexual activity during their trip.

67. July 19, 2013 Chief Cioffi invites Ms. Gebo via email to attend the Children's Cove Conference on Child Sexual Abuse.  He writes in the email: "do you want to go and stay off island for the night"

68. August 27, 2013 Chief Cioffi invites Ms. Gebo via email to the "Street Level Narcotics Investigation – 8 Day Program".

69. August 30, 2013 Chief Cioffi asks Ms. Gebo via email if they are attending the Children Cove Conference together.

70. Ms. Gebo and Chief Cioffi do not attend said conference

71. October 31-November 1 and November 4-7, 2013, Ms. Gebo attends the "Street Level Narcotics" course in Norwood, MA. Ms. Gebo stays off-island with friends during this course.

72. November 14, 2013 Ms. Gebo attempts suicide by overdosing on anti-depressants following a conversation with Chief Cioffi where he tells her that she won't do it, meaning attempt suicide.

73. During her hospital care, she discloses to hospital staff that she suffers from low self-esteem, and that she feels intimidated and/or threatened by her male peers at work.

74. Chief Cioffi requests that hospital staff do not commit Ms. Gebo to inpatient care, despite Mr. Gebo acknowledging Ms. Gebo's need for inpatient hospitalization.

75. Chief Cioffi requests that Ms. Gebo's care be transferred to a psychologist who works with police and other public safety personnel on a regular basis.

76. Approximately twenty-four hours after Ms. Gebo attempts suicide, she is cleared to return to work by said psychologist.

77. Following Ms. Gebo's suicide attempt she takes a short leave from work.

78. Chief Cioffi donates a portion of the hours (vacation, holiday, compensatory, sick, etc.) that he has accrued for Ms. Gebo to use instead of her own accrued time.

79. Following Ms. Gebo's suicide attempt, she begins to see a psychiatrist.

80. Chief Cioffi questions Ms. Gebo's suicide attempt, claiming the hospital staff advised him there was no evidence of overdose. Ms. Gebo subsequently requests her hospital records and allows Chief Cioffi to review them.

81. During the winter of early 2014, Ms. Gebo is "popping pills" (anxiety medication prescribed by her psychiatrist) on many of her shifts to reduce her anxiety. Chief Cioffi is aware of this behavior.

82. Ms. Gebo threatens several times to attempt suicide. Chief Cioffi tells her during those times that she will not do it.

83. Ms. Gebo threatens several times to disclose their sexual relationship to Chief Cioffi's wife and Ms. Gebo's husband. Ms. Gebo also threatens to tell the

town selectman. Chief Cioffi tells her several times that she will not do it. Chief Cioffi tells her in an email she will not "spill the beans".

84. Ms. Gebo takes more than the prescribed amount of her medications on several occasions in order to harm herself, but is never hospitalized.

85. January 6, 2014 Chief Cioffi emails Ms. Gebo; "You need to stop emailing because this email is open to public view."

86. January 14, 2014 Chief Cioffi invites Ms. Gebo via email to attend a training that investigates sex crimes against children.

87. February 6, 2014 Chief Cioffi invites Ms. Gebo to attend a four day seminar on Undercover Officer Survival Techniques.

88. In the winter of 2014, Ms. Gebo tells her husband in person at their home and Chief Cioffi's wife, via text message about her sexual relationship with Chief Cioffi.

89. During the Spring/Summer of 2014 Ms. Gebo and Chief Cioffi continue to have a sexual relationship, without the knowledge of their partners.

90. On March 26, 2014 Ms. Gebo forwards an email to Chief Cioffi about a course called "Preventing and Addressing Workplace Discrimination for employees". Ms. Gebo asks Chief Cioffi "Should I take this? Hahahaha". Chief Cioffi replies "NOOOOOOOOOO".

91. During the summer of 2014, Ms. Gebo threatens to shoot herself inside the Chilmark Police Department. Chief Cioffi takes the gun away from Ms. Gebo. Ms. Gebo is allowed to continue to work as a police officer carrying a gun.

92. During the summer of 2014 Ms. Gebo shoots off her gun while having an argument with Chief Cioffi over the phone because she is so distraught in an attempt to make him believe that she shot and killed herself. Ms. Gebo is allowed to continue to work as a police officer carrying a gun.

93. During the summer of 2014, Chief Cioffi threatens Ms. Gebo on several occasions that he will commit suicide.

94. During the summer of 2014, Ms. Gebo and Chief Cioffi have an argument while inside a cruiser. Ms. Gebo tries to exit the cruiser. Chief Cioffi grabs Ms. Gebo and leaves bruises on her arm.

95. Ms. Gebo continues the relationship with Chief Cioffi to make her work life tolerable.

96. August 8, 2014 Chief Cioffi invites Ms. Gebo to attend a five day training in Grafton via email.

97. In late August of 2014, Ms. Gebo and Chief Cioffi's sexual relationship ends permanently.

98. September 19, 2014 Chief Cioffi invites Ms. Gebo via email to attend a MPI Training.

99. September 24, 2014 Chief Cioffi asks Ms. Gebo via email if she is attending a Roundtable Meeting.

100. Over the course of the sexual relationship, Chief Cioffi and Ms. Gebo engage in sexual activity at the Chilmark Police station, Chief Cioffi's home, Ms. Gebo's home, in Chilmark Police cruisers, and several other locations.

101. Over the course of Ms. Gebo and Chief Cioffi's sexual and emotional relationship, they consistently have very volatile arguments leading to severe emotional distress and a hostile work environment for Ms. Gebo.

102. On several occasions Ms. Gebo threatens to resign from her position as full time police officer due to her hostile work environment, and inability to have a tolerable relationship with Chief Cioffi.

**Constructive Discharge Pursuant to a Hostile Work Environment**

103. During the Fall/Winter of 2014, Chief Cioffi threatens to put Ms. Gebo on administrative leave due to her distressed mental state, but does not.

104. In December of 2014 Ms. Gebo requests a one year leave of absence for medical reasons and is granted said leave in January 2015.

105. In February of 2015 Ms. Gebo enters a voluntary inpatient program at the Austen Riggs Center in Stockbridge, MA to work on her medical issues.

106. On March 6, 2015 Chief Cioffi writes "For ill will or harm I have caused I am apologetic" in an email to Ms. Gebo.

107.   March 7, 2015 Chief Cioffi writes in an email to Ms. Gebo during an argument which began over the phone: "I'm not. I don't want to engage in conversations with you. You have your versions and thoughts. I have mine. We disagree and still don't come to a settlement. You say you want to be nice. Yet you just email me I am a cold hearted bastard. Basically Liz I don't want to communicate with you. I honestly think the sooner you can bring yourself to not try to communicate with me the sooner you will feel better. The simplest way for me to put this is its time to move forward and stop all communications from now on until you either return to work or decide to resign."

108.   In June of 2015 Ms. Gebo discharges from the voluntary inpatient program at the Austen Riggs Center and continues seeking outpatient treatment until the end of August 2015 when she returns home.

109.   In the time before Ms. Gebo meets with Chief Cioffi on November 6, 2015, Ms. Gebo makes several attempts to form an amicable relationship with Chief Cioffi in order to make her workplace less hostile and more tolerable when she returns.

### Retaliation

110.   On November 6, 2015 Ms. Gebo meets with Chief Cioffi to discuss her return to work. Chief Cioffi tells Ms. Gebo that she cannot return to work because of her documented mood disorders.

111.   Ms. Gebo subsequently resigns from her position as a full time police officer, due to Chief Cioffi's reason for why she cannot return to work, and her belief that because of the state of her and Chief Cioffi's current relationship work would be unbearable and impossible.

## COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION

|  |  |
|---|---|
| ELIZABETH GEBO, | ) |
| *Complainant,* | ) |
| v. | ) |
| TOWN OF CHILMARK, and BRIAN CIOFFI, individually, | ) |
| *Respondents.* | ) |

MCAD No. 14 BEM 00526
EEOC No. 16C 2014-01028

### [PROPOSED] ORDER

Pursuant to Rule 1.10(6) of the Commission's Rules of Procedure, the above captioned

Complaint is hereby amended to clarify and amplify the claims of discrimination in the original

complaint to add a count of disability discrimination.

_____

SO AMENDED this\_\_\_\_day of_____, 2018



Michaela C. May
Attorney at Law
(617) 577-8800 x206
mmay@bennettandbelfort.com

May 16, 2018

*First-Class and Electronic Mail*

Attn: Marc Perlman, Esq., Investigator
Massachusetts Commission Against Discrimination
1 Ashburton Place, Room 601
Boston, MA 02108

**Re:   Elizabeth Gebo v. Town of Chilmark and Brian Cioffi (MCAD No.
16NEM02982)**

Dear Attorney Perlman,

This firm represents the Complainant, Elizabeth Gebo, in the above-referenced matter.
Enclosed please find the following materials for filing in this case:

(1) Motion to Amend, and

(2) Respondents' Opposition to Complainant's Motion to Amend.

If I can be any further assistance, please contact me at (617) 577-8800 x206 or
mmay@bennettandbelfort.com. Thank you for your time and attention to this matter.

Very Truly Yours,

Michaela C. May

CC:  Elizabeth Gebo
Leonard H. Kesten, Esq.

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

MCAD Docket No. 16NEM02982

ELIZABETH GEBO,

    Complainant,

    v.

TOWN OF CHILMARK,
BRIAN CIOFFI, Individually,

    Respondents.

## <u>RESPONDENTS' OPPOSITION TO COMPLAINANT'S<br>MOTION TO AMEND HER CHARGE</u>

The Complainant seeks to amend her Charge of Discrimination to add a claim for disability discrimination based on purported conduct that occurred in November 2015. Her Charge cannot be amended because her claim of disability discrimination does not relate to or arise out of the subject matter of the original Charge – which alleged sex discrimination and retaliation only – thus rendering her new allegations time-barred.

Both Massachusetts Courts and the Commission have consistently held that, pursuant to M.G.L. c. 151B, § 5, complaints filed beyond the 300-day filing period cannot be sustained. *Silvestris v. Tantasqua Regional School Dist.*, 446 Mass. 756 (2006); *Morin v. Murida Furniture Co.*, 2009 Mass. Super LEXIS 401, 9-10 (Mass. Super. Ct., Sept. 29, 2009) ("Under G.L. c. 151B, § 5, any claim … must be filed within 300 days of the occurrence of the alleged conduct."); *Libby v. Dept. of Food and Agriculture*, 22 MDLR 58 (2000) (dismissing former employee's complaint for missing the 300-day statutory period for seeking redress with the MCAD); *Eggert v. Cabot Corp.*, 21 MDLR 31 (1999) (dismissing employee's complaint as time-barred for failure to file a complaint within the applicable filing period). Here, the

1

Complainant seeks to add entirely new, unrelated allegations of disability-based discrimination far beyond the statutorily permitted time period.

The Complainant's reliance on 804 C.M.R. § 1.10(6)(a) is misguided. That regulation allows amendment of the Complainant's Charge and relation back to the date of the initial Charge only where there are additional acts of discrimination that relate to or arise out of the subject matter of the original complaint. Such is simply not the case here. The Complainant alleged in her original Charge that she was discriminated against on the basis of her sex and that her sexual relationship with Chief Cioffi was the discriminatory and retaliatory reason for not being permitted to return to the Department. While the Complainant might have alleged in her initial Charge that she suffered from mental illness, not once did she allege that her purported "mood disorder" was the basis for any adverse action taken by the Respondents. In fact, the Complainant alleged in her original Charge that her "mood disorder" was the *pre-textual* reason offered by Chief Cioffi to hide his discriminatory animus based on her sex. If, as the Complainant now paradoxically claims, her mood disorder was, in fact, the *real* reason given for the Chief's actions, then it cannot also be the pre-textual reason, and her original sex discrimination and retaliation claims must fail. The Complainant cannot have it both ways. The Complainant's attempt to add a discrimination claim in this context defies logic and is entirely fatal to her prior claims.

Finally, the Complainant's citation to the "scope of the investigation" rule is without merit. The "scope of the investigation" rule is applied to determine if a Complainant has properly exhausted her administrative remedies prior to filing a Superior Court complaint. *See Cook v. Entergy Nuclear Operations, Inc.,* 948 F.Supp.2d 40, 47 (D. Mass. 2013) (plaintiff who never alleged a failure to accommodate claim at the MCAD failed to exhaust administrative remedies and the court lacked jurisdiction over that claim). The rule does not apply to

situations such as this where the Complainant missed the statute of limitations and attempts to salvage an otherwise untimely claim by tacking it onto a completely unrelated claim of discrimination.

Here, the Complainant's disability claim is time-barred. It simply does not relate to or arise out of her original claims. If the Complainant is permitted to proceed with her disability claim because she alleges that it was the discriminatory reason given for the Respondents' purported adverse action and not the pre-textual reason given to cover its sex-based decision, then the Complainant's Charge for sex discrimination fails.

For these reasons, the Complainant's Motion to Amend must be denied. Pursuant to 804 C.M.R. 1.10(8)(f), the Respondents reserve their right to file a responsive pleading to the amended allegations if the Complainant's Motion is allowed

Respectfully submitted,
Respondents, Town of Chilmark, Brian Cioffi,
Police Chief, Individually,
By their attorneys,

*/s/ Michael Stefanilo, Jr.*
Leonard H. Kesten, BBO No. 542042
Michael Stefanilo, Jr., BBO No. 684500
Brody, Hardoon, Perkins & Kesten, LLP
699 Boylston Street
Boston, MA 02116
lkesten@bhpklaw.com
mtsfeanilo@bhpklaw.com
617- 880-7100

Dated: May 14, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the complainant's attorneys of record via e-mail on May 14, 2018.

/s/ Michael Stefanilo, Jr.
BBO No. 684500